### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Kelly Cormier, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 3:03cv1819 (JBA) |
| | : | |
| City of Meriden, | : | |
|     Defendant. | : | |

### RULING ON MOTION FOR SUMMARY JUDGMENT [DOC. # 29]

In the two remaining counts of her First Amended Complaint[1] [Doc. # 19], plaintiff Kelly Cormier ("Cormier") alleges that defendant City of Meriden ("City") failed to accommodate her medical needs, and retaliated against her, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA").  The City has moved for summary judgment on both counts, and for the reasons that follow, the motion is granted.

## I.  Factual Background

The summary judgment record reveals the following.  The City hired Cormier as a public safety dispatcher in October 2001. Def. L.R. 56(a)1 Stmt. ¶ 3; Pl. L.R. 56(a)2 Stmt. ¶ 3.  Municipal dispatchers handle the "911" calls for fire, police and ambulance service in Meriden.  The job description states that the "duties

---

[1]By a Ruling and an Endorsement Order dated September 30, 2005 [Docs. ## 19, 20], the Court dismissed Counts Two, Four and Five of the Complaint.  Consequently, the individual defendants (Mark Benigni, Mayor; Clinton Ross, Deputy Fire Chief; and Caroline Beitman, Personnel Director), who were named only in Counts Four and Five, also were dismissed.

include receiving calls for service from the public, broadcasting
appropriate instructions to police radio units or to other
services, such as the Fire Department, Highway Department, Dog
Warden or other police departments." Def. L.R. 56(a)1 Stmt. Ex.
1.[2]  Dispatchers are supervised by an employee of the
Communication Division and the Fire Chief.  <u>Id.</u>

> An undated addendum to the job description states:
>
> Dispatchers work thirty-nine (39) hours per week in eight
> (8) hour shifts.  Overtime is usually scheduled two weeks
> in advance, however, can occur at any time during any
> given week.  Normal overtime is scheduled in eight (8)
> hour increments, however, overtime is also scheduled in
> four (4) hour increments due to vacation/ sick time, etc.

<u>Id.</u>  The three dispatch shifts run from 8 a.m. to 4 p.m., 4 p.m.
to midnight, and midnight to 8 a.m.  Aff. of Personnel Director
Caroline Beitman, Def. L.R. 56(a)1 Stmt. Ex. 53 ¶ 8.  The second
and third shifts are paid at a higher rate than the first shift,
and voluntary overtime is paid at time-and-a-half, while
mandatory overtime is paid at double time.  <u>Id.</u> ¶ 9.

Each shift must be covered by three dispatchers.  <u>Id.</u>; Aff.
of Deputy Fire Chief Clint Ross, Def. L.R. 56(a)1 Stmt. Ex. 54 ¶
7.  Thus, there are provisions in the collective bargaining
agreement ("CBA") between the City and the dispatchers' union

---

[2]Plaintiff objected to all of defendant's exhibits on the
basis of lack of authentication.  <u>See</u> Pl. Obj. [Doc. # 41].  This
objection has been obviated by the Reply Affidavit of Brian
Giesing [Doc. # 44-1], which authenticates the various documents
maintained by the Fire Department.

governing overtime assignments in the event that shifts are left
open due to vacation, sick leave, or personal emergencies.  A
voluntary overtime list is compiled, and when coverage for
another shift is needed, the dispatchers are contacted in the
order they appear on the voluntary list.  If there are no
volunteers, the person seeking a replacement looks to the
mandatory list, which is compiled in the order of the dispatchers
who have signed up for the least overtime to the most overtime in
a given week.  The first person on the mandatory list is
obligated to accept an overtime assignment in the absence of
volunteers.  CBA Art. VIII, Def. L.R. 56(a)1 Stmt. Ex. 2; Beitman
Aff. ¶ 10.[3]  The CBA further provides that "[d]ispatchers
accepting a voluntary overtime must work at least 4 hours of such
shift.  Anytime the dispatcher has another dispatcher cover part
of the shift the Supervisor or the Fire Chief will be notified of
the change prior to the beginning of the shift."  CBA Art. VIII.
Meriden Deputy Fire Chief Clint Ross and Personnel Director
Caroline Beitman both state, "If a dispatcher's replacement fails
to show up, that dispatcher is required to remain on the job
until they are relieved to ensure that there are three
dispatchers on the job at all times."  Ross Aff. ¶ 10; Beitman

---

[3]Plaintiff disputes this characterization in the Defendant's
Rule 56(a)1 Statement because "[o]vertime is voluntary, and is
mandated only when no other qualified dispatcher is available."
Cormier Aff. ¶ 6.  The import of her disagreement is not
apparent, and the CBA speaks for itself.

Aff. ¶ 11.

**A.   Accommodation Requests**

On July 19, 2002, plaintiff notified Brian Geising, her immediate supervisor, that she had been diagnosed with multiple sclerosis.  Cormier Aff. ¶ 8.  On January 14, 2003, Cormier submitted a doctor's note to the Personnel Department stating that, due to her "neurological problems" and diagnosis of multiple sclerosis, she was "not to work more than 12 hours continuously."  Def. L.R. 56(a)1 Stmt. Ex. 4.  Cormier states that on January 15, 2003, she was told by Deputy Chief Ross "that I was no longer allowed to work more than eight consecutive hours.  However, in the event of an emergency, Mr. Ross told me that I would be mandated to work in violation of my doctor's limitations."  Cormier Aff. ¶ 11.  Cormier's statements are contradicted by a departmental memorandum that Giesing issued on January 16, which states:

> Per Deputy Chief Ross, Kelly has a doctor's note that restricts her to no more than 12 hours.  The rule for overtime hiring is this:
>
> 1.  When calling for overtime if she is not working the day of the overtime she may be called.
>
> 2.  If she is working her shift she may not be called for an 8 hour overtime before or after she is schedule[d] to work.
>
> 3.  For 4 hour overtime she may be offered as long as the overtime does not cause her to exceed 12 hours.
>
> 4.  For mandated overtimes rule[s] 1 and 3 would apply.

4

    5.  Other unforseen circumstances such as a holdover or an emergency would apply as long as the 12 hour rule is not exceeded.

Def. L.R. 56(a)1 Stmt. Ex. 6.  Cormier states that she was not consulted before this memorandum was posted in the dispatch office.  Cormier Aff. ¶ 13.

On January 17, Beitman sent a letter to Cormier asking her to have her doctor fill out a form stating whether her hours limitation would be temporary or permanent.  "The City will then [assess] if [the 12 hour limit] will be an undue hardship on them to grant...."  Def. L.R. 56(a)1 Stmt. Ex. 5.  Two days later, on January 19, 2003, Cormier filed a grievance with her union stating that she believed her request for a reasonable accommodation had been denied in violation of the ADA; specifically, she stated that Geising had denied her request to take an 8-hour overtime shift that adjoined her regular shift and split the overtime with another dispatcher, or else be offered overtime in 4-hour increments adjoining her regular shift.  Id. Ex. 7.

On January 22, 2003, Ross denied Cormier's grievance because the CBA "does not require someone who is unable to be called for a full overtime to be called for said overtime."  Id. Ex. 9.  On January 26, Cormier filed a step-two grievance and also wrote a letter to Beitman, asserting in both documents that the contract does not say that overtime only may be offered in eight-hour

increments.  Id. Ex. 10, 11.  Beitman scheduled a March 5 meeting
to discuss the grievance.  Id. Ex. 12.

On February 10, Cormier's neurologist forwarded the
completed Family and Medical Leave Act ("FMLA") paperwork to the
Personnel Department, stating that Cormier "is indeed capable of
working up to twelve hour shifts if circumstances dictate."  Id.
Ex. 13.

On February 14, prior to the scheduled grievance meeting,
Cormier filed a complaint with the Connecticut Commission on
Human Rights and Opportunities ("CHRO") alleging discrimination
because:

> My similarly situated non disabled counter parts are
> allowed to be offer[ed] over time and to split that
> overtime into four hour increments, I was the only person
> that was singled out, and told that I could not split my
> overtime the same way my non disabled coworkers are
> allowed to do.

Id. Ex. 14.

On February 19, 2003, Beitman sent a letter to Cormier
reiterating the City's position that permitting Cormier to take
any available 4-hour overtime shifts in conjunction with her
regular shift, or 8-hour overtime shifts not touching her current
shift, but prohibiting her from taking 8-hour shifts adjoining
her regular shift, "seems reasonable and compliant with the law
and your medical note."  Id. Ex. 16.  Beitman sent another letter
dated March 10, 2003, again restating the City's offered
accommodation and raising the City's concern about the

6

consequences if Cormier were to be assigned an 8-hour overtime shift immediately before or after her regular shift, and she was unable to find a replacement for 4 hours of that shift "or if the person you split with is unable to come in." Id. Ex. 17.  One week later, Beitman restated this concern to Cormier's attorney: "Ms. Cormier wants us to violate her physician's note and schedule her for eight (8) hour overtime slots before and after [her] shifts and allow her to swap her overtime if able.  The problem is, if she cannot swap [she] would be bound to work the eight ... hours or another employee would be penalized with an overtime they [sic] did not expect.  This violates other[s'] rights and puts the City in the position of having her work more than the physician allows." Id. Ex. 18.

Shortly thereafter, Cormier and Beitman participated in a mediation session with a CHRO representative.  The City offered the following proposed accommodation:

> As long as her regular shift remains 4:00 - 12:00, Ms. Cormier will continue to be offered all other overtime that does not touch her shift and all four (4) hour overtime assignments which do not have her working twelve (12) hou[r] shifts.
>
> A.   Ms. Cormier will be offered overtime on the 8:00 - 4:00 shift
> B.   If she is able to swap the 8:00 a.m. - 12:00 portion of the shift, she will take the 12:00 - 4:00 portion herself.
> C.   If she is unable to swap the 8:00 - [12:00] portion, she will give back the overtime as soon as she realizes, but in no case less than twenty-four (24) hours prior.
> D.   This may be reviewed at six (6) month

7

increments or if Ms. Cormier's health changes.

(The review will ascertain if this is creating an undue
hardship on the City or other employees in the Dispatch
Center.)

Id. Ex. 19.  Thus, the limitations in the proposal were that
Cormier could not be called for an 8-hour overtime shift on the
midnight to 8:00 a.m. shift if she also worked her regularly-
scheduled 4:00 to midnight shift, and she could not accept
overtime on the 8:00 to 4:00 shift unless she was able to swap
the first four hours with another dispatcher.

The City attempted to put this plan in place as of March 24,
2003.  On that date, Deputy Chief Ross forwarded the City's
proposal to Brian Giesing.  Id. at Ex. 20.  Ross's note stated
"Ms. Cormier has suggested this as a reasonable accommodation and
although we are currently working with her on other issues, since
this do[es] seem reasonable we'd like to put it into place
immediately so she do[es] not lose out on OT."[4]  Id.  Giesing
sent a memo to "All Crew Chiefs" the same day notifying them that
Cormier could "now be offered overtimes on the 8-4 shifts even if
they are touching [but she] is NOT to be offered 12-8 shifts on
touching shifts."  Id. Ex. 20.

Also on that same date, however, Cormier's counsel wrote to
Beitman that "[a]lthough Mrs. Cormier is agreeable to the

---

[4]This sentence appears to have been added at the suggestion
of someone else, as an attached unidentified e-mail message
indicates.

overtime provisions [in the City's proposed stipulation], she is concerned with other portions of the agreement.  Mrs. Cormier does not wish to withdraw her CHRO complaint...." <u>Id.</u> Ex. 21. Plaintiff's counsel also requested that the City reimburse plaintiff "for lost overtime wages and reasonable attorney's fees."  <u>Id.</u>  The parties dispute whether Cormier was willing to accept any overtime at this point; the City states that Cormier declined overtime until there was an agreement in writing, while Cormier states that she never told her supervisors that she would not take overtime.  <u>See</u> Cormier Aff. ¶ 21; Email from Ross, 3/24/05, Def. L.R. 56(a)1 Stmt. Ex. 22.  The evidence is unclear as to whether Cormier worked any overtime after March 24.

On October 22, 2003, plaintiff's doctor wrote a note that, due to worsening symptoms of her multiple sclerosis, Cormier was not to work more than 8 hours per day.  Def. L.R. 56(a)1 Stmt. Ex. 39.  There does not appear to be any dispute that this requirement was accommodated by the City at that time.  <u>See</u> <u>id.</u> Ex. 40-42.  On December 24, 2003, Cormier's attorney wrote to Beitman stating that Cormier had been forced to work over 8 hours, but on Beitman's request for clarification did not specify any dates Cormier's work restrictions may have been violated, and the dispatch records did not show that Cormier had been required to work longer than eight hours.  Def. L.R. 56(a)1 Stmt. Ex. 51; Beitman Aff. ¶ 24.

**B.   Alleged Retaliation**

Earlier, on April 9, 2003, Cormier filed a written complaint with the City regarding an allegedly hostile encounter with another dispatcher, Russell Mitch, who was unhappy about plaintiff's 12-hour maximum work schedule.  Id. Ex. 25.  Beitman states that "[u]pon performing [an] investigation, the dispatcher in question denied that the incident took place and no witnesses were identified who heard or saw the alleged incident as described by the plaintiff."  Beitman Aff. ¶ 15.  Cormier states that her coworkers told her that Beitman did not interview them about the incident.  Cormier Aff. ¶ 22.

Plaintiff claims that on September 23, 2003, she "was disciplined for failure to properly dispatch fire apparatus," but that she was not responsible for assigning fire apparatus, and the responsible dispatcher was not disciplined.  Cormier Aff. ¶ 23.  The record contains no evidence concerning the nature of any discipline Cormier received or the circumstances of the alleged breach of protocol.

Cormier states that on October 10, 2003, she was denied a requested day of FMLA leave.  The City's paperwork states that Cormier first requested a vacation day, and when that was denied, requested FMLA leave.  Beitman wrote that the dispatch department as well as the Personnel Department were "aware that [Cormier] moved into a new house today which would not be an appropriate

use of sick time or FMLA."  Def. L.R. 56(a)1 Stmt. Ex. 33.
Beitman asked for a doctor's note for the date of October 10,
2003, which does not appear to have been provided.  Cormier has
not disputed that she asked for the time off to move into her new
house.

On October 30, 2003, Cormier received a one-day suspension
for failing to timely complete required FMLA paperwork,[5] with the
result that her absence from work between September 3 and
September 21, 2003 was deemed unexcused.  Def. L.R. 56(a)1 Stmt.
Ex. 38.  As a consequence of the suspension, Cormier was
ineligible for a year to be a "crew leader," or the most senior
dispatcher on a shift.  Crew leaders receive an extra $1/hour
($8/shift) above their normal rate of pay.  Beitman Aff. ¶ 17.

Also on October 30, 2003, Cormier received a "counseling
letter" for an incident involving an employee of the personnel
department, Rose Kevorkian.  The parties agree that Kevorkian
asked Cormier to leave her post to accept a letter but Cormier
states that she "could not leave," Cormier Aff. ¶ 26.  Beitman's
disciplinary letter states that Cormier was on the phone with her
husband, and warns her "that official business takes preceden[ce]

---

[5]Plaintiff states that on December 16, 2003, the reason for
her discipline was changed "from FMLA abuse to failure to provide
proper medical documentation for my disability."  Cormier Aff. ¶
30.  However, the original letter of discipline clearly states
that the reason for the suspension was Cormier's failure to
submit medical documentation by the October 22, 2003 deadline.
There is no evidence in the record of any change on December 16.

over personal calls...."  Def. L.R. 56(a)1 Stmt. Ex. 36.

Finally, on November 19, 2003 Cormier received a "written letter of consultation" that was "based on a number of complaints on actions" Cormier had taken in the past week that were outside protocol or resulted in a delayed response by emergency personnel.  Id. Ex. 48.  Cormier states that "other employees" involved in the incidents were not disciplined, Cormier Aff. ¶ 29, but the underlying complaints made by police officers about Cormier's behavior do not identify any other dispatchers as involved in these incidents.  See id. Ex. 44, 47.

## II.  Standard

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact to be resolved at trial and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Materiality is determined by the substantive law that governs the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of

12

establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim.  Celotex, 477 U.S. at 322-23.  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'"  Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").  The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor.  Anderson, 477 U.S. at 249 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").  In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion.  Matsushita, 475 U.S. at 587.  However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R.

13

Civ. P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient.  Id. at 586 (citations omitted).

## III. Discussion

### A.   Count One: Failure to Accommodate

The ADA prohibits discrimination on the basis of disability, and defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business ...."  42 U.S.C. § 12112(b)(5)(A).  "The term 'reasonable accommodation' may include– ... job restructuring, [and] part-time or modified work schedules...."  Id. at § 12111(9).

When claiming a violation of these provisions, the plaintiff bears the initial burden of establishing a prima facie case. Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 118 (2d Cir. 2004).  The elements of this prima facie burden are: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  Id. The first two elements are not contested here.

Defendant argues, in part, that plaintiff cannot make out a

14

prima facie case because it did make a reasonable accommodation for Cormier when it proposed a modified work schedule.  "By requiring reasonable accommodation [in the ADA], 'Congress intended simply that disabled persons have the same opportunities available to them as are available to nondisabled persons.'" Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 218 (2d Cir. 2001) (quoting Wernick v. Fed. Reserve Bank, 91 F.3d 379, 384 (2d Cir. 1996)).  "Whether or not something constitutes a reasonable accommodation is necessarily fact-specific. Therefore, determinations on this issue must be made on a case-by-case basis."  Wernick, 91 F.3d at 385 (citation omitted).

"A modified work schedule may constitute a reasonable accommodation in certain circumstances."  Rodal, 369 F.3d at 120. To be reasonable, the modification should "eliminat[e] the conflict between" the employer's scheduling requirements and the employee's needs, without imposing "a significant work-related burden on the employee without justification."  See Cosme v. Henderson, 287 F.3d 152, 159 (2d Cir. 2002) (Title VII religious practice accommodation).  However, "'reasonable accommodation' does not mean elimination of any of the job's essential functions."  Wernick, 91 F.3d at 384 (quoting Gilbert v. Frank, 949 F.2d 637, 644 (2d Cir. 1991)).

"The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the

employer and the qualified individual with a disability. ...
[T]he employer providing the accommodation has the ultimate
discretion to choose between effective accommodations and may
choose the less expensive accommodation or the accommodation that
is easier for it to provide."  29 C.F.R. § 1630.9 App. Note.

Two days after Cormier's doctor limited her to a maximum of
12 hours, the City posted a memorandum permitting Cormier to
accept all 4-hour overtime shifts and any 8-hour overtime shift
on a day she was not scheduled for her regular shift, but
forbidding her to accept an 8-hour overtime "before or after she
is schedule[d] to work."  Def. L.R. 56(a)1 Stmt. Ex. 6.

Plaintiff has offered no evidence showing that the City's
January 2003 proposal was unreasonable.  The only evidence in the
record shows that the City offered Cormier the ability to bid on
essentially all overtime shifts that would not pose a risk of
violating her medical restrictions, and she refused this
accommodation.  The limitation in the City's proposal was that
Cormier could not bid on contiguous 8-hour shifts.  This
accommodation successfully strikes a balance between the
employer's need for three dispatchers on duty at all times and
Cormier's medical restriction; there would have been no risk of
Cormier exceeding her 12 consecutive work hour medical limitation
under the City's plan.

Cormier appears to argue that the plan was unreasonable

16

because it burdened her ability to earn overtime income, but she has not provided any evidence showing the impact of the City's proposal on her ability to earn overtime income.  Nor is there evidence of whether Cormier's own proposal (that she be allowed to bid on all overtime shifts and to swap portions that would exceed her 12-hour limit), had it been implemented, would have resulted in more overtime opportunities for her.  Plaintiff has not shown how many available overtime shifts, if any, she was precluded from bidding on during the relevant time period.  Cormier also has failed to proffer affidavits from any coworkers indicating that they would have been willing to split these available shifts with her had she been permitted to bid on them.[6]  Thus there is no evidence in the record that there were specific 4-hour overtime periods available that the City's proposal would have prevented Cormier from accepting.

The fact that the City offered as part of the March 2003 settlement proposal to allow Cormier also to bid on contiguous 8:00 a.m. to 4:00 p.m. shifts, if she could swap the first four

_____

[6]It appears that Cormier advanced a disparate treatment argument before the CHRO, specifically that her similarly-situated non-disabled coworkers were allowed to split shifts but she was not.  In Count One of the present complaint, she has advanced only a failure-to-accommodate claim, not a disparate treatment claim.  Even if she were to advance a disparate treatment claim, she has offered no evidence supporting such a claim because she has not proffered evidence of how non-disabled employees were treated during the relevant time period, and/or that there were shifts she was precluded from taking and that she had a colleague willing to split those shifts with her.

17

hours, does not alter the analysis.  The fact that a potentially better accommodation was offered later does not render the first accommodation necessarily unreasonable.  "[T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations," 29 C.F.R. § 1630.9 App. Note, and the ADA does not necessarily entitle plaintiff to her preferred accommodation as long as the offered one does not create a significant burden on her.

Plaintiff's failure to offer evidence of the consequence of some overtime being off-limits to her under the City's proposal compared to her own proposal, from which it could be inferred that the City's proposal was unreasonable, dooms her <u>prima facie</u> case.  The City offered Cormier the ability to bid on most overtime shifts, and Cormier has not shown any negative effect on her income or any other aspect of her job if she had accepted the City's proposal.  Just as the City was willing to try to accommodate Cormier, Cormier should have tried the City's proposed schedule to see if it was reasonable or unreasonable.  Because she did not do so, she cannot show that the City's accommodation would have led to a "significant diminution in salary, benefits, seniority or other advantages."  <u>Norville v. Staten Island Univ. Hospital</u>, 196 F.3d 89, 99-100 (2d Cir. 1999).

Cormier has failed to show that the City refused to make a reasonable accommodation, as required under the fourth prong of

18

the prima facie case.  Therefore the City is entitled to judgment as a matter of law on Cormier's failure-to-accommodate claim.

### B.   Count Three: Retaliation

Cormier also asserts that the City retaliated against her for requesting an accommodation, in violation of the ADA. "Claims for retaliation [under the ADA] are analyzed under the same burden-shifting framework established for Title VII cases." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002). "In order to establish a prima facie case of retaliation, a plaintiff must show that: (1) [s]he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against [her]; and (4) a causal connection exists between the alleged adverse action and the protected activity."  Id.  "Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision.  If a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation."  Id. at 721.

The first two elements of the prima facie case are undisputed, as Cormier informed her supervisor about her multiple sclerosis and requested scheduling accommodations due to her

19

diagnosis.  The City argues that plaintiff cannot show she suffered an adverse employment action, nor that there was any causal connection between any adverse action and plaintiff's requests for accommodation.

The evidence shows that in September and October 2003, plaintiff received three written reprimands and a one-day unpaid suspension.  An adverse employment action is "a materially adverse change in the terms, privileges, duration and conditions of employment," and may include "negative employment evaluation letters."  Id. at 720.  Therefore the one-day suspension without pay, which also resulted in a one-year loss of eligibility for the crew-leader premium, and the written disciplinary letters, which were placed in plaintiff's personnel file, can be considered adverse employment actions, and it will be assumed for present purposes that the plaintiff has established this element.

Under the fourth prong, plaintiff argues that there is a close temporal relationship between her requests for accommodation, which continued through the summer and fall of 2003, and the discipline imposed on her.  Temporal proximity of "a few months" may be sufficient to infer retaliation.  Id. at 720-21.

Nonetheless, plaintiff has not brought forth any evidence from which a rational factfinder could conclude that the employer's proffered reasons for disciplining her were

pretextual.  First, according to the contemporaneous
documentation, the one-day suspension was imposed on October 30,
2003 because Cormier failed to provide timely medical
documentation for an extended absence in September for a surgical
procedure that was not related to her multiple sclerosis.
Beitman gave her several chances to submit the paperwork, with a
final deadline of October 22, and the record shows that Cormier
did not submit the documentation until October 24.  Second, the
written memorandum from Beitman reprimanding Cormier for
requesting FMLA leave on October 10 was based on Beitman's belief
that Cormier requested time off for the non-FMLA-covered purpose
of moving into a new house, and Cormier has not presented any
evidence to the contrary.  Third, the written disciplinary letter
relating to the incident with Rose Kevorkian was issued on the
basis that Cormier put a personal call to her husband above her
official duties, and was rude to a colleague.  While Cormier has
stated that she "could not leave" her post to accept the letter
from Kevorkian, and thus presumably did not intend to be rude,
she has not disputed the City's evidence that she was actually
speaking to her husband on the phone at that time.  Finally, the
November 19, 2003 written reprimand was issued after several
accusations from police officers (and, in one case, a dispatcher
from another town) that Cormier had violated protocol in handling
various emergency calls.  Cormier has not presented any evidence

that these accusations were untrue, or that other employees who committed similar infractions were treated differently.  She does state that "[o]ther employees" involved in these particular incidents "were not disciplined," Cormier Aff. ¶ 29, but there is no evidence in the officers' written complaints or the reprimand memorandum that any other employees were involved with these calls.

Cormier also alleges retaliation on the grounds that two coworkers behaved inappropriately toward her.  First, she states that on April 9, 2003, Russell Mitch, a coworker, made negative comments about her new schedule.  Cormier Aff. ¶ 22; Def. L.R. 56(a)1 Stmt. Ex. 25.  Second, Cormier states that on October 8, 2003, "Diane Larson, a co-worker, approached me while at work and began to ridicule me because of my disability.  Mr. Geising was present and did not stop the incident.  I filed a complaint with the City of Meriden; however, Mrs. Larson was not disciplined." Cormier Aff. ¶ 24.

There is no evidence connecting these events with the alleged adverse employment actions against plaintiff, namely the one-day suspension and the written letters of reprimand. Furthermore, plaintiff has proffered no evidence that these alleged incidents of harassment were perpetrated by anyone in a supervisory capacity or are otherwise attributable to the City of Meriden.  Plaintiff argues that "The Defendant produced no

investigations" of these events, Pl. Mem. of Law [Doc. # 40] at 12, but the burden at this stage of the analysis is for plaintiff to proffer evidence from which a reasonable trier of fact could infer that the alleged acts were perpetrated by the City in retaliation for plaintiff's exercise of her ADA rights. Plaintiff has not come forward with such evidence, and therefore her retaliation claim must be dismissed.

**IV.  Conclusion**

Accordingly, defendant's motion for summary judgment [Doc. # 29] is GRANTED and this case will be closed.

IT IS SO ORDERED.

/s/

_____
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 3rd day of March, 2006.**